**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | Case No.: 2:16-cr-00265-GMN-NJK |
| Plaintiff, ) | |
| vs. ) | **ORDER** |
| ) | |
| CESAR MORALES, *et al.*, ) | |
| ) | |
| Defendants. ) | |

Pending before the Court is the Motion to Strike Gary Rudnick's Testimony, (ECF No. 1876), filed by Defendant Cesar Morales ("Morales"). The Government filed a Response, (ECF No. 1934), and Morales filed a Reply, (ECF No. 1950). The Court conducted a hearing on Morales's Motion on November 19, 2019. (*See* Mins. of Proceedings, ECF No. 1985); (Tr., ECF No. 1986).

Also pending before the Court is Defendant Ernesto Gonzalez's Notice Opting Out of Any Joinder, (ECF No. 1947), to Morales's Motion, (ECF No. 1876). Co-defendants Albert Lopez, Albert Perez, and James Gillespie filed Motions for Joinder, (*see* ECF Nos. 1958, 1961, 1978, respectively), to Gonzalez's Notice. The Court finds that Defendants Lopez, Perez, and Gillespie are similarly situated to Defendant Gonzalez. Accordingly, the Motions for Joinder, (ECF Nos. 1958, 1961, 1978), are **GRANTED**. Additionally, pursuant to the Court's Minute Order dated October 17, 2018, (ECF No. 1328), Defendants Pastor Palafox, Diego Garcia, and Bradley Campos are joined in Morales's Motion, (ECF No. 1876).

///

///

## I. BACKGROUND[1]

On September 12, 2019, the Government called Gary "Jabbers" Rudnick as its witness. (*See* Mins. of Proceedings, ECF No. 1832). On September 18, 2019, the Government's direct examination of Rudnick concluded and counsel for Defendant Albert Lopez, Mr. Mark Fleming, was the first defense attorney to question Rudnick. (Mins. of Proceedings, ECF No. 1852). Mr. Fleming asked whether Rudnick had a face-to-face meeting with Mr. Fleming, and his investigator, Mr. Scott Bakken, on November 28, 2017, at a Starbucks in California. (*See, e.g.*, Tr. 52:9–54:12, ECF No. 1853). Rudnick denied that the face-to-face meeting took place. (*Id.* 54:13) (Rudnick responding, "I never met with you."); (*Id.* 54:18) (same). When pressed on this matter, Rudnick continued to assert that he did not meet with Mr. Fleming and Mr. Scott Bakken on November 28, 2017. (*Id.* 54:24) (Rudnick stating, "I never sat down with you and met with you."); (*Id.* 63:4) (Rudnick stating, "I didn't even meet with you."). Mr. Fleming also asked Rudnick if he had previously told Mr. Fleming that Defendant Lopez was never part of a conspiracy to kill Mr. Pettigrew, and that Mr. Pettigrew's death was the result of a bar fight that got out of control. (*See id.* 53:6–56:19). Rudnick denied making such statements to Mr. Fleming. (*Id.*).

Cross-examination continued and Mr. Fleming moved on to other matters. Eventually, Mr. Fleming asked: "Isn't it a fact that . . . you've been granted immunity in exchange for your testimony?" (*Id.* 83:16–17). The Government objected, arguing a lack of good-faith basis. (*Id.* 84:4–5). Immediately thereafter, the following exchange took place:

> FLEMING: But, Mr. Rudnick, have you been—have you consulted with an attorney before you sat down and started testifying here?
> RUDNICK: No, because I'm telling the truth.
> FLEMING: Your Honor, this—I don't know if this is my responsibility, but Mr. Rudnick needs to speak to a lawyer.

---

[1] The parties are familiar with the facts in this case and the Court will not repeat them here except where necessary.

> GOVERNMENT: Objection, Your Honor.
> FLEMING: May we have a—a recess?

(*Id.* 84:15–23).

Once outside the presence of the jury, the Government confirmed that Rudnick had not been granted immunity and that he had not been appointed an attorney to explain the implications of testifying under oath. (*See id.* 87:13–89:16). After hearing from the parties, the Court appointed counsel for Rudnick and recessed so that Rudnick could have an opportunity to consult with his attorney. (*See id.* 91:5–11); (*see also* Tr. 97:6–18, ECF No. 1854).

The following day, on September 19, 2019, Rudnick's counsel informed the Court that an immunity agreement had been reached and that the agreement "is limited to use immunity for [Rudnick's] testimony relating to the VICAR murder." (Tr. 8:24–9:4, ECF No. 1859). In addition, Rudnick's counsel indicated:

> I believe now, . . . that what Mr. Rudnick is going to say is that when he—and I'm making an attorney proffer now, Your Honor. When he denied a meeting with Mr. Fleming and Mr. Bakken, that that was not truthful; that there was, in fact, a meeting. I believe, again, by way of attorney proffer, that he had consistently denied that meeting to the government, although I was not privy, obviously, to their meetings.

(*Id.* 9:14–22). The Government then orally moved to strike Rudnick's testimony in its entirety. (*Id.* 20:17–19). Some defendants, including Morales, joined the Government's motion. Other defendants also indicated that they would join the motion to strike, but only if certain Counts were dismissed. (*See, e.g.*, *id.* 52:1–57:20). The Court denied the Government's motion to strike subject to further briefing from the parties. (*See* Tr. 74:20–76:7).

At that time, the Court also heard from Rudnick's counsel, who expressed concerns about having Rudnick provide additional testimony because doing so could expose Rudnick to liability under 18 U.S.C. § 1001 (prohibiting, *inter alia*, omitting material facts, making materially false statements to federal agents, officials). (*See id.* 39:16–40:19). The Court

indicated that Rudnick could properly assert his Fifth Amendment right against self-incrimination in response to questions designed to elicit whether Rudnick committed a § 1001 offense (*e.g.*, whether Rudnick lied to federal agents regarding the face-to-face meeting with Mr. Fleming and Mr. Bakken). (*Id.* 43:17–22). The Court also explained that the subject of what was spoken during the meeting with Mr. Fleming and Mr. Bakken was appropriate for cross-examination. (*See, e.g.*, *id.* 36:17–20, 39:5–23, 43:23–44:5). Furthermore, the Court asked whether there was any objection to allowing Rudnick's counsel to sit beside him on the witness stand so that Rudnick could consult with his attorney as to immunity and Fifth Amendment issues. (*Id.* 42:3–13). No party objected. (*Id.* 42:14–18). To further address the concerns noted by Rudnick's counsel, the Government stipulated to present a statement to the jury in order to correct the record without having Rudnick admit that he made false statements to federal agents.[2] Cross-examination resumed.

Days later, on September 23, 2019, the Government filed a Notice, (ECF No. 1861), indicating that it would not be renewing its motion to strike because case law did not support the Government's position. (*See* Notice 2:11–3:5, ECF No. 1861) (citing *United States v. Bourjaily*, 167 F.2d 993 (7th Cir. 1948)). Counsel for Morales subsequently renewed the request to join the Government's motion to strike. (Tr. 9:14–10:13, ECF No. 1865). However, the Court clarified that there was no motion to strike pending pursuant to the Government's Notice of non-renewal. (*Id.* 10:14–12:24). Rudnick's examination continued, and Rudnick asserted his Fifth Amendment privilege in response to a number of questions. Rudnick's testimony concluded on September 24, 2019. Morales's Motion to Strike Rudnick's Testimony now follows.

---

[2] The Government presented the jury with the following statement: "The government agrees and stipulates that on November 28th of 2017, Gary Rudnick had a face-to-face meeting with Defense Attorney Mark Fleming and Mr. Scott Bakken which last[ed] over two hours." (Tr. 78:14–18, ECF No. 1859).

## II. DISCUSSION

In his Motion, Morales argues that the testimony of the Government's witness, Gary Rudnick, should be stricken from the record based on Rudnick's invocation of his Fifth Amendment privilege to refuse to answer certain questions during cross-examination and re-cross examination. (Mot. to Strike ("Mot."), ECF No. 1876). Specifically, Morales maintains that "Rudnick's repeated and consistent invocations of the Fifth Amendment denied Mr. Morales an opportunity for meaningful confrontation as required under the Sixth Amendment to the United States Constitution." (*Id.* 13:21–14:3). A review of the record reveals that Rudnick's invocations of the privilege were to questions involving his November 2017 face-to-face meeting with Defendant Albert Lopez's counsel, Mr. Mark Fleming, and his investigator, Mr. Scott Bakken; questions concerning Rudnick's May 2016 meeting with defense investigator Ms. April Higuera; questions regarding whether Rudnick concealed each of the aforementioned meetings from federal agents and prosecutors; and other matters.

The Sixth Amendment protects the right of a defendant in a criminal case to confront and cross-examine his or her accusers. *United States v. Williams*, 626 F.2d 697, 701 (9th Cir. 1980) (citing *Smith v. Illinois*, 390 U.S. 129 (1968)). Where a witness asserts a valid privilege against self-incrimination on cross-examination, all or part of that witness's testimony must be stricken if invocation of the privilege blocks inquiry into matters which are "direct" and are not merely "collateral." *United States v. Seifert*, 648 F.2d 557, 561 (9th Cir. 1980) (citing *Williams*, 626 F.2d at 702). "Where the privilege has been invoked as to purely collateral matters, there is little danger of prejudice to the defendant and, therefore, the witness's testimony may be used against him." *Williams*, 626 F.2d at 702 (quoting *United States v. Cardillo*, 316 F.2d 606, 611 (2d Cir. 1963)). "If the subject upon which the witness refuses to testify relates to matters elicited by the government on direct examination and the defendant's counsel is prejudicially impaired in [his or her] ability to assail the truthfulness of the direct testimony, the court should

strike at least the relevant portion of the testimony." *United States v. Singer*, 785 F.2d 228, 242 (8th Cir. 1986). Striking a witness's entire testimony because he invokes the Fifth Amendment is "an extreme sanction." *United States v. Lord*, 711 F.2d 887, 892 (9th Cir. 1983).

Matters are "direct" when invocation of the privilege deprives the defendant of his right to test the truth of direct testimony or when answers to the questions would have undermined the Government's case. *Seifert*, 648 F.2d at 562; *see also United States v. Gullett*, 713 F.2d 1203, 1208–09 (6th Cir. 1983) ("If assertion of the privilege precludes inquiry into matters which involve elements or specific events of the crimes charged, there may be substantial danger of prejudice in not allowing the defendants to test the truth of the witness' direct testimony."). "Collateral" means that the evidence does not speak directly to the matters put at issue by the indictment. *Williams v. Borg*, 139 F.3d 737, 742 (9th Cir. 1998). Furthermore, questions going to the credibility of a witness deal with collateral matters. *United States v. Delgado*, 869 F.2d 1498 (9th Cir. 1989) (citing *United States v. Brutzman*, 731 F.2d 1449, 1452 (9th Cir. 1984)). The Ninth Circuit has previously explained that "[t]he distinction between matters which are 'collateral' and those which are 'direct' is not precise or easy. It can be drawn only by reference to the particular facts of the particular case, and we recognize that '[a] trial court has wide discretion to determine whether a witness's testimony must be stricken because cross-examination was restricted.'" *Seifert*, 648 F.2d at 561–62 (internal citations omitted).

Here, the Court finds that Rudnick's Fifth Amendment invocations did not violate Morales's rights under the Confrontation Clause of the Sixth Amendment. As Morales contends, Rudnick repeatedly invoked his Fifth Amendment privilege when asked about conversations he had with federal agents regarding Rudnick's face-to-face meeting with Mr. Fleming and Mr. Bakken. The following colloquy serves as an example.

> FLEMING: You had numerous conversations with government agents and prosecutors after we met at the Starbucks in November of 2017. True?

> RUDNICK: Yes, I did.
> FLEMING: Okay. And in a number of those meetings you were asked specifically about the meeting; right?
> RUDNICK: What meeting? You?
> FLEMING: Our meeting, yes.
> RUDNICK: Yeah. I'm going to take the Fifth on this.
> FLEMING: You're going to take the Fifth on that question?
> RUDNICK: Yes.
> FLEMING: Well, let me ask you this: How many times did you meet with the agents and prosecutors after our meeting occurred where the discussion of the meeting came up? How many times?
> RUDNICK: I'm going to take the Fifth on that.
> FLEMING: Okay. And without you disclosing what you may have said to the agents about our meeting, was the topic of the meeting raised in those numerous debriefings; yes or no?
> RUDNICK: I'm going to take the Fifth on that.
> FLEMING: Was Mr. Han, the prosecutor sitting here in court, present with you when the subject matter of the Starbucks meeting ever occurred?
> RUDNICK: I'm going to take the Fifth.

(Tr. 75:20–76:17, ECF No. 1863). However, whether federal agents asked Rudnick about the November 2017 meeting with Mr. Fleming or how many times Rudnick may have met with federal agents and prosecutors following the November 2017 meeting are issues that have no bearing on the allegations in the indictment. While this line of questioning may have gone to Rudnick's credibility, questions going to the credibility of a witness deal with collateral matters. *United States v. Delgado*, 869 F.2d 1498 (9th Cir. 1989). Consequently, Rudnick's Fifth Amendment invocations did not deprive Morales of his Sixth Amendment rights.

Notably, before the above line of questioning took place, the Court made clear that the content of the 2017 November meeting—*i.e.*, the subject of what was spoken during the meeting—was an appropriate area of inquiry.[3] (*See, e.g.*, Tr. 36:17–20, 39:5–23, 43:17–22, ECF No. 1859). The Court also indicated that Rudnick would be allowed to invoke his Fifth

---

[3] Indeed, while being cross-examined, Rudnick testified that during the November 2017 meeting, he told Mr. Fleming, *inter alia*, that Defendant Lopez was not involved in the conspiracy to kill Mr. Pettigrew.

Amendment privilege in response to questions concerning whether he lied to federal agents about meetings with Mr. Fleming, Mr. Bakken, Ms. Higuera, or otherwise—because such questions could expose Rudnick to liability under 18 U.S.C. § 1001. (*See id.*). Defense counsel was in no way precluded from questioning Rudnick about the events underlying the VICAR murder charged in the indictment—namely, the September 23, 2011 killing of Mr. Pettigrew—because Rudnick had use immunity as to that matter. (*See* Tr. 8:24–9:4, ECF No. 1859) (confirming Rudnick's use immunity for testimony relating to the VICAR murder charge).

Morales similarly argues that Rudnick's Fifth Amendment invocations as to the May 2016 meeting with Ms. Higuera denied Morales his confrontation rights under the Sixth Amendment. Here, the questions focused on whether Rudnick concealed the meeting from federal agents and prosecutors, and whether Rudnick made particular statements during the meeting. Regarding the former, whether Rudnick concealed the meeting from federal agents and prosecutors is an issue that has no bearing on the elements or specific events of the crimes charged, and is thus collateral. For the following reasons, the same can be said of the latter.

First, it should be noted that the defense was able to present ample evidence showing the exact statements Rudnick made to Higuera during the May 2016 meeting. To explain, this line of questions occurred immediately after an audio recording of the meeting was played for the jury. (*See* Tr. 88:1–17, ECF No. 1863). Each specific statement which defense counsel asked about was heard in the audio recording, (*see e.g.*, *id.* 99:16–18) ("The jury just heard your words. You said, 'what really happened was a bar fight that happened between me and Pettigrew; correct?'"), and when Rudnick was asked if he recognized his voice in the recording, he responded that he did. (*See id.* 88:18–21). Therefore, by acknowledging the voice as his own, Rudnick essentially confirmed that he made each of the statements which defense counsel subsequently asked about. Moreover, before introducing the audio recording into evidence, defense counsel introduced Rudnick's sworn statement, which he wrote and signed during the

May 2016, and which outlines the same statements contained in the recording. (*Id.* 84:3–87–25). Further, defense counsel introduced photographs of Rudnick holding his signed statement. (*Id.* 82:19–84:2). Rudnick identified himself in the photographs and acknowledged that the photographs were taken the day of his meeting with Higuera. (*Id.*). As such, Morales was not prejudiced in his ability to present evidence concerning the statements Rudnick made to Higuera during the May 2016 meeting.

Next, as Morales points out, it is true that "Rudnick invoked when questioned as to whether he had [stated during the meeting with Ms. Higuera that] what really occurred was a bar fight that happened between [Rudnick] and Pettigrew." (Reply 3:25–4:4, ECF No. 1950) (internal quotations omitted). According to Morales, "if Mr. Rudnick had been forced to answer the question, he may have acknowledged that there was no conspiracy and it was just a bar fight gone wrong. This answer would result in an acquittal for Mr. Morales—an answer that is not collateral." (*Id.*). However, that Rudnick may have *told* Higuera that what really occurred at the Nugget was a bar fight, is not a central issue and has no bearing on the elements or specific events of the crimes charged in the indictment. On the other hand, had Rudnick been asked whether "what really occurred [on September 23, 2011] was 'a bar fight that happened between [Rudnick] and Pettigrew,'" the question would involve a direct matter, and Rudnick's invocation of the privilege would have denied Morales's rights under the Confrontation Clause.

To be sure, Morales has failed to articulate how his counsel was impaired and thus precluded from questioning Rudnick about "what really occurred" and whether "it was just a bar fight gone wrong." To the extent that Morales contends Rudnick's invocation of the privilege was in any way improper, Morales's counsel did not make a single objection to Rudnick's Fifth Amendment invocations. Morales's counsel could have moved the Court to compel Rudnick's response, but Morales's counsel made no such motion. *See Yakus v. United*

*States*, 321 U.S. 414, 444 (1944) ("No procedural principle is more familiar to this Court than that a . . . right may be forfeited in criminal as well as civil cases by the failure to make timely assertion of the right before a tribunal having jurisdiction to determine it."). Furthermore, when the Court asked Morales's counsel whether he would be conducting cross-examination, Morales's counsel indicated that "we're not going to be cross-examining Mr. Rudnick," (Tr. 9:19–21, ECF No. 1865), and "on behalf of Cesar Morales, we have no questions for Mr. Rudnick." (*Id.* 142:12–15); (*see also id.* 185:8–10) ("Nothing on behalf of Mr. Morales.").

In attempting to explain why Morales chose not to cross-examine Rudnick, Morales's counsel indicated, during the November 19, 2019 motion hearing, that he refrained from conducting cross-examination because he "relied" on the Government's motion to strike. More specifically, Morales's counsel made the following representations to the Court:

> You may remember, before—when Mr. Rudnick admitted that he had been lying, that the Government stood up and said we want his testimony stricken. First thing that Mr. Morales did was stand up and say, we agree. Strike it. So from that point on—and you may even remember at some point, and I don't have the day, I actually stood up and I asked the Court, would there be a deadline when I could file the motion?[4] And you said, there is no deadline. You know, just file it. And I then filed it a few days later.
>
> So that shows the intent of Morales, that right away we thought it's going to be stricken. When they asked that it be stricken, I agreed, yes, strike it. And then they retreated from that position. . . .
>
> And [so] now for us to be somehow penalized by the Government, we had a right to rely upon the Government's authority. We had—we detrimentally —if the Court rules that I should have got up and asked the same 80 questions, then I relied to my detriment on the Government's invitation, and I believed that the Government would in fact continue that invitation. They would move to strike, I would move to strike, and it would be stricken.
>
> And so the Government, as I pointed out in my motion, really retreated, and I perhaps should be faulted for relying upon the word of the Government. And that's a pretty sad state of affairs when I can't stand up and say, if they want it stricken, Mr. Morales agrees, and then be able to rely upon it. And then not

---

[4] Counsel for Morales asked the Court to set a briefing schedule as to the instant Motion to Strike on September 25, 2019—the day after Rudnick concluded his testimony. (Tr. 5:12–19, ECF No. 1868).

only that, but then file the motion. I'm the first one to file this motion and say strike it. And why is the Government retreating?

(Tr. 39:15–40:19, ECF No. 1986).

However, this explanation is unconvincing because the Government filed its Notice of nonrenewal of the motion to strike on September 23, 2019—one day before Rudnick concluded his testimony. Thus, there was no motion to strike pending, and in turn, Defendants could not join the motion or "rely" upon it, as Morales's counsel asserted at the motion hearing. To the extent this was not immediately clear to the parties, any confusion was resolved the following morning. Specifically, on September 24, 2019—*before* Rudnick returned to the witness stand—Morales's counsel made the following statement to the Court: "[W]e again renew our request that Mr. Rudnick's testimony be stricken." (Tr. 9:15–18, ECF No. 1865). The Court responded with the following:

> So what I'm hearing from the Defense is a belief that the motion to strike is still ripe. However, the Government filed a notice of nonrenewal of the motion to strike, which I took to mean that they were not going to be proceeding with the motion to strike, effectively withdrawing the motion to strike.

(*Id.* 10:14–20). The Government then confirmed that it would not be renewing its motion to strike:

> GOVERNMENT: [E]ssentially, we are telling—advising the Court that we do not have legal support for our motion that was orally denied on the record. So I don't know if that's a withdrawal of the motion, oral motion, or a notice of a nonrenewal of the motion or basically saying that we don't have, you know, a legal basis to pursue the motion beyond the oral motion that was made.
>
> THE COURT: Right. *So there's no motion pending*, essentially.

(*Id.* 11:3–10) (emphasis added). The Court further stated:

> So that doesn't mean that the Defense can't raise a motion to strike if they want to, but I just wanted to be clear it would be a Defense motion to strike, not a response to the Government's motion to strike, *because there is no Government's motion to strike pending at this time*.

(*Id.* 13:1–5) (emphasis added). Thereafter, Rudnick's testimony resumed, and as mentioned above, Morales's counsel subsequently declined to cross-examine Rudnick. In short, Morales learned that the Government would not be renewing its motion to strike *before* Rudnick left the witness stand. Thus, Morales's representation that he refrained from conducting cross-examination because he relied on the Government's motion to strike is inconsistent with the sequence of events.[5] Moreover, Morales's suggestion that the Government is now "somehow penalize[ing]" him because he believed that the "Government would in fact continue the invitation [to strike the testimony]," makes little sense. As made abundantly clear by the Government's Notice of nonrenewal and during trial proceedings on September 24, 2019, the Government "retreated" such invitation because case law did not support its motion to strike.

Morales further argues that his Sixth Amendment confrontation right was denied when Rudnick invoked his Fifth Amendment privilege in response to a jury question asking whether Rudnick knew when he first advised law enforcement about "the second side OM meeting, *i.e.*, the powwow." However, the Sixth Amendment protects the right of a *defendant* to confront and cross-examine his accusers. *United States v. Williams*, 626 F.2d 697, 701 (9th Cir. 1980) (citing *Smith v. Illinois*, 390 U.S. 129 (1968)). On the other hand, "direct questioning by jurors is a 'matter within the judge's discretion[.]'" *See United States v. Bush*, 47 F.3d 511, 514 (2d Cir. 1995); *see also United States v. Gonzales*, 424 F.2d 1055, 1056 (9th Cir. 1970) (per curiam). That said, if Morales wanted an answer to the jury question, nothing precluded his counsel from asking it in the form of a follow-up question.

Additionally, the Court does not find that Rudnick's Fifth Amendment invocation when asked whether "the basis of the conspiracy to which [Rudnick] pled . . . was the story that [Rudnick] told these Federal agents," prevented Morales's adversarial testing of the truth of

---

[5] Nevertheless, Morales was not precluded from conducting cross-examination and reserving his right to move to strike Rudnick's testimony at a later time.

1  Rudnick's direct testimony. (*See* Tr. 18:6–21, ECF No. 1865). As the Government points out,
2  Rudnick would have no personal knowledge regarding the evidence on which state prosecutors
3  relied in making decisions to bring charges. (Resp. 18:21–19:2, ECF No. 1934).

Morales lastly argues that throughout cross-examination, Rudnick repeatedly consulted with counsel before answering questions, and therefore, these consultations also rendered confrontation meaningless. In particular, Morales relies on *Perry v. Leeke*, 488 U.S. 272 (1989), and submits that "[a] witness called to the stand becomes 'in a sense a ward of the Court. He is not entitled to be cured or assisted or helped approaching his cross-examination.'" (Mot. at 14, n.2) (quoting *Perry*, 488 U.S. at 274). However, it was defense counsel that initially urged the Court to provide Rudnick with an attorney so that he may better understand the legal implications of his testimony. (*See* Tr. 84:15–23, 88:3–90:12, 91:16–22, ECF No. 1853). And when the Court asked whether there were any objections to having Rudnick's counsel sit beside him so that counsel could answer Rudnick's questions on self-incrimination and immunity issues, neither the Government nor any of Defendants' attorneys objected. (Tr. 42:3–18, ECF No. 1859).

Morales also relies on *Perry* for the proposition that a "[t]rial judge can decide, 'that cross-examination is more likely to elicit truthful responses if a witness is prohibited from having mid-testimony consultation.'" (Reply 5:24–27, ECF No. 1950) (quoting *Perry*, 488 U.S. at 274). But there is no evidence that Rudnick's counsel had information about the facts of this case or that she was providing advice about how to answer factual questions. So, while a trial court *can* decide that cross-examination is more likely to elicit truthful responses if a witness is prohibited from having mid-testimony consultation, the circumstances here did not lead the Court to reach that decision. Because Morales provides no additional support for his contention that Rudnick's consultations with counsel rendered confrontation meaningless, Morales's argument fails.

The Court notes that Rudnick initially invoked his Fifth Amendment privilege in response to cross-examination questions regarding drug smuggling activities in Mexico; his meetings with federal prosecutor David Karpel; his federal grand jury testimony; and calls he received on the night of September 23, 2011. However, after consulting with his counsel, Rudnick withdrew his invocations and answered those questions. Therefore, Rudnick's withdrawn invocations did not block inquiry into either direct or collateral matters, and Morales's Sixth Amendments rights were not affected.

In sum, the Court finds that Rudnick invoked the privilege against self-incrimination as to collateral matters. To the extent Rudnick may have invoked the privilege as to direct matters, not once did Morales or any of his co-defendants object or move the Court to compel Rudnick's response to their questions. As such, Morales was not denied his Sixth Amendment confrontation rights. Accordingly, Morales's Motion to Strike Gary Rudnick's Testimony, (ECF No. 1876), is **DENIED**.

### III. CONCLUSION

**IT IS HEREBY ORDERED** that Morales's Motion to Strike Gary Rudnick's Testimony, (ECF No. 1876), is **DENIED**.

**IT IS FURTHER ORDERED** that the Motions for Joinder to Gonzalez's Notice, (ECF Nos. 1958, 1961, 1978), filed by Defendants Lopez, Perez, and Gillespie are **GRANTED**.

**DATED** this __24__ day of November, 2019.

_____
Gloria M. Navarro, District Judge
United States District Court